Filed 2/28/14  In re Andrea G. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re ANDREA G. et al., Persons Coming Under the Juvenile Court Law. | H040071 (San Benito County Super. Ct. No. JV0800035) |
| SAN BENITO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. I.P., Defendant and Appellant. | |

Appellant I.P. (mother) appeals from the juvenile court's orders terminating her parental rights to her daughters Andrea G. and Jasmine P.  She contends that the juvenile court should have concluded that the parental relationship exception applied here and precluded termination of parental rights.  We reject her contention and affirm the juvenile court's orders.

**I.  Background**

In 2008, eight-year-old Jasmine was detained after she reported that mother had physically abused her on two separate occasions.  On one occasion, mother slapped her

on the cheek. On the other occasion, mother threw Jasmine on a bed, causing her head to hit the headboard. Jasmine suffered a large bump on her head from this incident. The court took jurisdiction over Jasmine based on mother's substance abuse and anger management problems, removed Jasmine from parental custody, placed her in foster care, and granted mother reunification services.[1]

Mother had supervised visits with Jasmine twice a week, and she was attentive to and appropriate with Jasmine during these visits. Jasmine was happy in her foster home, and she "blossomed" after being placed there. Mother initially made little progress on her case plan, but the court continued her reunification services for a second six-month period. In late 2009, the court ordered that mother be allowed longer, unsupervised visits after she made additional progress on her case plan.[2] These unsupervised visits went well. Reunification services were continued for a third six-month period with the hope that Jasmine would soon be returned to mother's care. In April 2010, mother was granted a 10-day extended visit with Jasmine. In May 2010, Jasmine was returned to mother's care with family maintenance services. In October 2010, mother gave birth to Andrea. In November 2010, Jasmine's 2008 dependency case was dismissed.

In July 2011, Andrea was found unsupervised under a bed crying, with bags tied around her body, in a residence where the only adult was unconscious and under the influence. Mother was not present and could not be found. Jasmine was found at Andrea's father's parents' home. Andrea and Jasmine were detained. Both mother and Andrea's father were arrested for child endangerment. Mother subsequently told the social worker that she had left Andrea with her brother's girlfriend overnight so that she

---

[1] The identity and whereabouts of Jasmine's biological father are unknown.

[2] Shortly thereafter, mother's infant son died of "monoxide poisoning" from a gas leak in her home. Mother engaged in grief counseling and seemed to be dealing with her loss.

and her boyfriend, Andrea's father, could go to the beach. Mother admitted that she had been drinking and knew that her brother's girlfriend had also been drinking, but mother denied that she had used any drugs. A drug test revealed that mother had been using methamphetamine. Mother subsequently admitted that she had begun using methamphetamine after the dismissal of Jasmine's 2008 dependency case. Andrea's father reported that mother had substance abuse and anger management problems. Jasmine reported that both mother and Andrea's father drank routinely. The court took jurisdiction over both Andrea and Jasmine, removed them from parental custody, placed them in foster care, and granted mother reunification services including supervised visitation.

Mother had two-hour visits once a week with Jasmine and Andrea, and these visits were appropriate. In December 2011, mother was allowed a five-hour supervised visit with the children to have a birthday party for Jasmine. Mother made progress on her case plan, and her reunification services were extended in February 2012 for another six months with visitation moving to unsupervised. In June 2012, mother briefly relapsed, but she acknowledged her lapse and reengaged in her services. Mother was being allowed unsupervised visits of between four and 72 hours per week. Jasmine was reported to have "mixed feelings" about the possibility of reunifying with mother because she did not want to leave Hollister. In September 2012, the court extended mother's reunification services for another six months.[3] Mother continued to be allowed unsupervised visits, and the maximum was increased to 96 hours per week.

In late September 2012, mother was arrested for battery on a police officer, and it became apparent that she had relapsed again. Her visits were changed back to supervised for one to three hours per week. Mother was incarcerated until late October 2012, and she ceased contact with the social worker after her release. She also ceased engaging in

---

[3] Andrea's father's services were terminated.

services and visiting the children. Mother's only further visits with the children were two supervised visits in December 2012 and one in January 2013. Mother contacted the foster parent in January 2013 to attempt to arrange a visit. The foster parent was amenable, but mother never followed through. Mother also did not heed the foster parent's suggestion that she contact the social worker.

By February 2013, a decision had been made to place Jasmine and Andrea in the home of their half-siblings' paternal grandmother where their half-siblings also resided. The half-siblings' paternal grandmother was committed to adopting Jasmine and Andrea. Jasmine was "happy" about the prospect of being adopted by this woman, whom she considered her grandmother, and was looking forward to spending more time with her half-brothers. Jasmine and Andrea were placed in this prospective adoptive home at the beginning of March 2013. Jasmine adjusted well to this placement, and her behavior and schoolwork improved. Mother did not appear at the March 2013 uncontested 18-month review hearing, and the court terminated services and set a Welfare and Institutions Code section 366.26[4] hearing for July 1, 2013. Mother's visitation was terminated pending further order.

Mother contacted the social worker on April 30, 2013 and requested visitation. The social worker told her to talk to her attorney. On May 29, 2013, mother filed a section 388 petition seeking placement of the children in her care with family maintenance services or additional reunification services. She asserted that circumstances had changed because she had been in a residential treatment program for two months and had maintained her sobriety throughout that period. The court ordered an evidentiary hearing on the petition, which was held just before the continued section

_____

[4]     Subsequent statutory references are to the Welfare and Institutions Code.

366.26 hearing on July 8, 2013.[5] The sole witness at the section 388 evidentiary hearing was one of the directors of mother's residential treatment program. The program was run by a church, and neither the program nor any of the three women running it were licensed or certified. The program did not involve any drug or alcohol testing. Mother was taking anger management and substance abuse classes and engaging in counseling. The court denied the petition.

Thirteen-year-old Jasmine reported that she "would like to have contact with her mother when possible, but would like the adoption . . . to go through." Jasmine felt a "close connection" to her "grandmother" and wanted to be adopted by her. Jasmine's court appointed special advocate (CASA) believed that Jasmine needed "stability and permanence in her life."

Mother did not present any evidence at the section 366.26 hearing. Her trial counsel asked the court not to terminate parental rights and argued that it was in the children's best interest to have continued contact with mother. The court terminated parental rights and selected adoption as the permanent plan for Jasmine and Andrea. Mother timely filed a notice of appeal from the court's orders.

## II. Analysis

Mother claims that the juvenile court erred in failing to find that the parental relationship exception applied and precluded termination of parental rights.

"Adoption must be selected as the permanent plan for an adoptable child and parental rights terminated unless the court finds 'a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with

---

[5] The court allowed mother a brief visit with Jasmine and Andrea in court on July 1, 2013 after the court continued the section 366.26 hearing to July 8.

the child and the child would benefit from continuing the relationship.' " (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).)  This is known as the parental relationship exception.

The proponent of the parental relationship exception bears the burden of producing evidence of the existence of a beneficial parental relationship.  Because the existence of such a relationship is a factual issue, the court's finding on this point is reviewed for substantial evidence.  (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)  "[A] challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.'  [Citation.]  Unless the undisputed facts established the existence of a beneficial parental or sibling relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed."  (*Ibid*.)

Even if the juvenile court finds a beneficial parental relationship, the parental relationship exception does not apply unless the court also finds that the existence of that relationship constitutes a "compelling reason for determining that termination would be detrimental . . . ."  (§ 366.26, subd. (c)(1)(B).)   A juvenile court's ruling on whether there is a "compelling reason" is reviewed for abuse of discretion as the court must "determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and . . . weigh that against the benefit to the child of adoption."  (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)

" 'The factors to be considered when looking for whether a relationship is important and beneficial are:  (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs.'  [Citation.]  'Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.

6

[Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent.' [Citation.] Evidence of 'frequent and loving contact' is not sufficient to establish the existence of a beneficial parental relationship." (*Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1315-1316.)

Mother plainly failed to meet her burden of producing evidence of the existence of a beneficial parental relationship. She produced no evidence whatsoever at the section 366.26 hearing. While her trial counsel argued that the children would benefit from continued contact with mother, she never mentioned the parental relationship exception to adoption or identified any evidence that could have supported a finding that mother had maintained such a relationship. The undisputed facts in the record did not establish the existence of a beneficial parental relationship. During the nine months preceding the section 366.26 hearing, mother had just three supervised visits with the children. She abandoned them for seven months (October and November 2012, and February through June 2013). Mother's absence from the children's lives was not brief. This was a significant portion of Andrea's life, as she was just two years old when mother ceased visiting her regularly in October 2012. And this was a critical time in Jasmine's life, as she was just becoming a teenager and dealing with all that goes along with such a critical transformation in a young girl's life. Mother clearly did not maintain "regular visitation and contact" with Jasmine and Andrea. (§ 366.26, subd. (c)(1)(B)(i).) The juvenile court's implied finding that she failed to establish the existence of a beneficial parental relationship is not only supported by substantial evidence but is the only finding that could possibly be made on the evidence that was before the court.

Mother's reliance on *In re Scott B.* (2010) 188 Cal.App.4th 452 (*Scott B.*) is misplaced. Eight-year-old Scott was placed in a foster home due to the mother's neglect, and the mother was denied reunification services. (*Scott B.*, at pp. 456-457.) Scott was a

special needs child with autism and other difficulties who had an "'extremely close bond'" with the mother. The mother maintained consistent weekly visitation during the two years that Scott was in foster care, missing only one visit, and Scott enjoyed and looked forward to the visits. (*Scott B.*, at pp. 457-461, 463, 467.) Scott's foster family was interested in adopting him, but Scott was adamantly opposed to being adopted and said he would run away if adoption occurred. (*Scott B.*, at p. 462.) He insisted that he wanted to live with the mother, and he even once attempted to run away from his foster family. (*Scott B.*, at pp. 462, 466.) Scott's CASA believed that it was "imperative" that Scott maintain contact with the mother and opined that it would be "detrimental" to him for their relationship to be disrupted. (*Scott B.*, at p. 465.) The juvenile court found that the mother had established the existence of a beneficial parental relationship, but it concluded that the benefit of this relationship did not outweigh the benefits of adoption. (*Scott B.*, at p. 468.) The Second District Court of Appeal reversed because it concluded that the evidence indisputably established that it would be detrimental to Scott to terminate his relationship with the mother. (*Scott B.*, at p. 472.)

The case before us is unlike *Scott B.* In *Scott B.*, the juvenile court found that there *was* a beneficial parental relationship, and the only issue was whether the benefit of that relationship outweighed the benefits of adoption. Here, the juvenile court impliedly found that there was *no* beneficial parental relationship, and the evidence provides no support for the existence of such a relationship. Thus, there was no need to consider whether the potential detriment from the termination of this relationship outweighed the benefits of adoption. Where no beneficial parental relationship exists, the parental relationship exception does not apply.

### III. Disposition

The orders are affirmed.

8

_____

Mihara, J.

WE CONCUR:

_____

Bamattre-Manoukian, Acting P. J.

_____

Grover, J.